IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**MARINE INDUSTRIAL CONSTRUCTION, LLC**,

　　　　　　　Plaintiff,

　　v.

**THE UNITED STATES**,

　　　　　　　Defendant.

No.  15-1189
Judge Lydia Kay Griggsby

<u>**SECOND AMENDED COMPLAINT**</u>

**NATURE OF THE CASE**

1.　　Plaintiff Marine Industrial Construction, LLC ("MIC") brings this action pursuant to the Contract Disputes Act, 41 USC Section 7101 et seq. and 28 USC Section 1491 to set aside an improper termination for default, for damages and additional time, and to set aside an improper demand for payment resulting from Defendant's breach of an express contract under which MIC provided dredging services for the Quillayute River Waterway, LaPush, WA ("Waterway").

**PARTIES**

2.　　Plaintiff MIC is an Oregon limited liability company that, in part, provides dredging services.

3.　　Defendant is the United States.  The contract at issue was entered into by and through the United States Department of the Army, Corps of Engineers ("USACE").

**JURISDICTION AND VENUE**

4.　　Jurisdiction and venue in this Court are proper under 41 USC Section 7101 et seq. and 28 USC Section 1491.

　　　　　　　　*52733-73743 2493090_3\P/1/16/2017*

## FACTUAL BACKGROUND

5.      In 2002, the USACE solicited dredging services for the Waterway.  The specifications required a 12" pipe for hydraulic dredging and provided warnings about substantial garbage, frequent down times, high water events, log traffic that would flow through the site during high water events and made prior dredging records available for bidders.

6.      In 2003, the USACE solicited dredging services for the Waterway.  The specifications required mechanical dredging and provided warnings about substantial garbage, frequent down times, high water events, log traffic that would flow through the site during high water events and made prior dredging records available for bidders.

7.      In 2007, the USACE solicited dredging services for the Waterway.  The specifications required a 12" pipe for hydraulic dredging and provided warnings about substantial garbage, frequent down times, high water events, log traffic that would flow through the site during high water events and made prior dredging records available for bidders.

8.      In 2009, the USACE solicited dredging services for the Waterway.  The specifications required a 12" pipe for hydraulic dredging and provided warnings about substantial garbage, frequent down times, high water events, log traffic that would flow through the site during high water events and made prior dredging records available for bidders.

9.      In 2011, the USACE solicited dredging services for the Waterway.  The specifications required a 12" pipe for hydraulic dredging and provided warnings about substantial garbage, frequent down times, high water events, log traffic that would flow through the site during high water events and made prior dredging records available for bidders.

10.     Also in 2011, USACE performed tests to characterize the sediments in the Waterway.  The USACE determined that the sediments in the Boat Basin contained a substantial amount of clay.

52733-73743 2493090_3\P/1/16/2017

11.     For the contract at issue, in 2014, the USACE solicited dredging services for the Waterway.  The USACE modified the usual specifications for the Waterway to remove the requirement for a 12" pipe for hydraulic dredging, removed the warning about substantial garbage, removed the warning about frequent down times, removed the warnings about high water events, removed the warnings about log traffic that would flow through the site during high water events and which did not make prior dredging records available for bidders.

12.     USACE entered into a contract with MIC to perform certain dredging of the Waterway ("Project"), such contract being entitled W912DW-14-C-0024, FY 14 Maintenance Dredging, Quillayute River Waterway, LaPush, WA.  The Project was divided into 3 parts: (1) Outer Navigation Channel, (2) Inner Navigation Channel, and (3) Boat Basin.  The contract required the use of "Hydraulic Dredging."  The contract placed restrictions upon when and where work could be performed.  Work could not start in the Outer Channel until September 1, 2014.  Work in the Inner Channel and Boat Basin could not start until October 1, 2014.  All work had to be completed by February 28, 2015.  The contract provided for time extensions.  The contract represented that the physical data was the result of site investigations.

13.     The contract described the "material to be removed" as "cobbles to fine silts." The contract represented that "the Government ha[d] no knowledge of cables, pipes, or other artificial obstructions or of any wrecks, wreckage, or other material that would necessitate the employment of additional equipment for economical removal."  The contract indicated that the USACE had already acquired the necessary permits.  The contract required depositing the dredged material by a hydraulic process.  The contract required the contractor, if the discharge pipe had a leak, to stop work until the pipe was repaired.  The contract allowed the contractor up to 14 days after notice to proceed to submit its dredging plan.

14.     The contract incorporated acquisition clauses dealing with differing site conditions (FAR 52.236-2) and excusable delay (FAR 52.249-10).

15.    MIC traveled to the Waterway pre-bid and performed an inspection.  Nothing seen by MIC during its site inspection contradicted any representation of the physical characteristics made by the contract.

16.    The project had a narrow work window between 9/1/14 and 2/28/15, a period of 180 calendar days.  Bids were opened on August 25, 2014.  The contract was awarded on September 12, 2014 and Notice to Proceed was issued on September 24, 2014.  With the additional 14 days allowed to the contractor under the contract to submit a dredging plan, dredging was not expected to begin until 10/8/14.  As a result, the Project suffered a loss of 37 good weather days from the dredging window, amounting to a loss of 21% of the available dredging days or 47% of the good weather days.  The delayed start pushed much more of the dredging into the winter months when the weather became more problematic for dredging, resulting in a need to perform more dredging per day when the weather would not cooperate.

17.    Dredging started 11/10/14.

18.    Starting 11/19/14 and continuing to 11/21/14, a wind storm occurred making it unsafe to perform dredging operations in Outer Channel due to high winds and large swells.

19.    On 11/20/14, MIC's dredge was fouled with garbage.

20.    Starting on 11/25/14 and ending on 11/30/14, a second storm occurred, peaking with a flow over 10,000 cfs and a river stage increase change of over 6 feet.  This event damaged the discharge pipeline.  MIC received permission to dredge in Inner Channel due to the treacherous conditions.  MIC began dredging operations in Inner Channel on 12/4/14.

21.    Starting on 12/8/14 and ending on 12/14/14, a third storm occurred and the river rose to over and sustained 16,300 cfs, resulting in a 10 foot river gage increase in less than 48 hours.  The flows remained over 10,000 cfs for 18 hours.  During this storm, MIC had to cease dredging operations.  MIC spent the two days recovering and repairing the disposal pipe.  MIC also spent significant amounts of time clearing logs from behind the barge.

52733-73743 2493090_3\P/1/16/2017

22.     Starting on 12/19/14 and ending on 12/21/14, a fourth storm occurred and MIC again had to cease dredging operations due to unsafe conditions in the channel caused by high flow and wind.

23.     In late December 2014, MIC began to dredge material in the Boat Basin.  The material could only be removed at a highly reduced rate as the material encountered contained a significant amount of clay, making the material more consolidated.

24.     On 12/31/14 and 1/3/15, MIC's dredge was fouled with garbage.

25.     Starting on 1/4/15 and ending on 1/8/15, a fifth storm occurred.  MIC had to cease operations in both the Boat Basin and Inner Channel due to conditions, including a 9.5 foot change in river stage in less than 24 hours, with flows over 10,000 cfs sustained for 15 hours. MIC spent 3 days recovering and repairing the pipe across the river.  The Crane Barge was moved to the Boat Basin due to constant poor conditions in Inner and Outer Channel.  MIC began procuring additional pipe to place a second pipe across the channel to allow both the Crane Barge and MudCat to operate simultaneously in the Boat Basin.

26.     On 1/12/15, 1/13/15, 1/14/15, and 1/17/15, MIC's dredge was fouled with garbage.

27.     On 1/18/15, a sixth storm occurred with a 5.5 foot change in river levels.  MIC's dredging was also impacted by garbage.

28.     On 1/20/15, 1/21/15, 1/22/15 and 1/23/15, MIC's dredge was fouled with garbage.

29.     Starting on 1/25/15 and ending on 1/27/15, a seventh storm occurred.  MIC had to cease dredging operations as both pipes placed across the river broke due to high flow and logs. MIC spent three days repairing both pipes across the river.

30.     On 1/27/15, 1/28/15, 1/29/15, 1/30/15, 1/31/15, 2/1/15, 2/2/15, 2/3/15, 2/4/15, and 2/5/15, MIC's dredge was fouled by garbage.

31.     On 2/3/15, MIC purchased a specialized piece of equipment known as a Dragflow in the hope that it would pump the clay-like basin materials at a higher rate.

32.     Starting on 2/6/15 and ending on 2/10/15, an eighth storm occurred with the river rising over 10 feet in 23 hours to peak flows over 10,000 cfs, with sustained flows over 10,000 cfs for over 22 hours.  MIC had to cease dredging operations.

33.     On 2/12/15, 2/13/15,  2/16/15, and 2/17/15, MIC's dredge was fouled by garbage.

34.     Also on 2/17/15, one of MIC's dredges was damaged by a sunken boat and the dredge had to be removed from site to be repaired.

35.     On 2/19/15, 2/20/15, 2/21/15, 2/22/15, 2/24/15, 2/25/15, 2/26/15, and 2/27/15, MIC's dredge was fouled by garbage.

36.     By Contracting Officer Decision dated 2/27/15, USACE terminated the contract for default as set forth in the original Complaint. A copy is attached as Exhibit 1.

37.     On 2/28/15, the work window closed.

38.     During reprocurement, USACE returned to its historical specifications with their ample warnings.

39.     On 8/5/15, MIC submitted a certified claim in seeking the amount of $638,260.81, 117.5 days of excusable delay, and 80.5 days of additional contract time.

40.     By Contracting Officer Decision dated 4/15/16, the USACE denied the claim in full.  A copy is attached as Exhibit 2.

41.     By Contracting Officer Decision dated 12/21/16, the USACE demanded MIC pay it the amount of $1,031,751.50, comprised of $409,345.50 in increased cost of the work, $271,006 for reprocurement costs, and $351,400 for 251 days of liquidated damages.  A copy is attached as Exhibit 3.

42.     By filing the Complaint, First Amended Complaint and this Second Amended Complaint, MIC has timely filed a complaint contesting the Contracting Officer Decision dated

52733-73743 2493090_3\P/1/16/2017

2/27/15, the Contracting Officer Decision dated 4/15/16, and the Contracting Officer Decision dated 12/21/16.

## FIRST CLAIM FOR RELIEF – BREACH OF CONTRACT

### (Denial of Valid Claim)

43.    Plaintiff hereby incorporates Paragraphs 1 through 42.

44.    USACE breached the implied warranty of plans and specifications.  USACE required the use of a specific type of dredging (hydraulic) that was unsuitable for the work actually to be performed.  The required hydraulic dredging was not suitable for weather events, traffic, artificial debris or clay-like materials.  USACE warranted that adequate results would be achievable.  They were not and such constitutes a breach of the warranty.  MIC is entitled to the additional costs and time necessary to deal with the breach of warranty.

45.    MIC encountered differing site conditions.  USACE required hydraulic dredging, which is unsuitable for projects with traffic, severe weather, artificial debris or clay-like materials.  USACE described the materials as running from cobbles to fine silts with no known artificial debris, artificial obstructions, wrecks or other material that would require employment of additional equipment.  MIC in fact encountered substantial differing site conditions when it found substantial artificial debris, multiple wrecks, clay and log traffic.  These conditions are different than what was represented in the contract.  MIC is entitled to the additional costs and time necessary to deal with the differing conditions.

46.    USACE failed to disclose superior knowledge.  USACE intentionally withhold information from bidders, including that the  Project required a minimum sized pipe, that there would be log traffic, that artificial debris was present, that wrecks were present, that frequent downtime would occur, and withheld all previous dredging records.  USACE was also in possession of information showing that the basin was clay-like. USACE withheld information impacting performance, costs and duration.  MIC encountered the very things that USACE knew

52733-73743 2493090_3\P/1/16/2017

about but withheld.  MIC is entitled to the additional costs and time necessary to deal with the conditions that USACE failed to disclose.

47.     In total, MIC has encountered 117.5 days of excusable delay.  MIC incurred $638,260.81 in additional costs caused by USACE's breach of warranty, the differing site conditions encountered, and USACE's failure to disclose its superior knowledge.  MIC is entitled to an additional 80.5 days to complete the work.

## SECOND CLAIM FOR RELIEF – BREACH OF CONTRACT

### (Improper Termination for Default)

48.     Plaintiff hereby incorporates Paragraphs 1 through 47.

49.     Based on the proceeding, MIC has encountered 117.5 days of excusable delay that precluded USACE from terminating MIC.  MIC is entitled to an additional 80.5 days to complete the work.  The termination for default was wrongful and it must be converted to a termination for convenience.

## THIRD CLAIM FOR RELIEF – BREACH OF CONTRACT

### (Improper Demand for Payment)

50.     Plaintiff hereby incorporates Paragraphs 1 through 49.

51.     The termination for default was wrongful and it must be converted to a termination for convenience.

52.     The USACE's demand that MIC pay it the amount of $1,031,751.50 was wrongful and must be set aside.

WHEREFORE, Plaintiff prays for judgment against the United States on its Complaint as follows:

a.     Finding that Plaintiff was entitled to 117.5 days of excusable delay;

b.     Converting the termination for default to a termination for convenience;

c.     Awarding Plaintiff $638,260.81;

d.      Awarding Plaintiff  80.5 days of additional contract time, compensable delay;

e.      A declaration that that USACE demand for payment was wrongful and such

demand is void;

f.      Prejudgment and post judgment interest at the rate allowed by law, along with

costs incurred herein;

g.      Awarding Plaintiff its reasonable attorney fees pursuant to the Equal Access to

Justice Act;

h.      Such other relief as the Court finds to be just and equitable.

Dated this 16th day of January, 2017.

JORDAN RAMIS PC


By: s/ Joseph A. Yazbeck, Jr.
      **JOSEPH A. YAZBECK, JR**
      OSB # 77400
      Two Centerpointe Dr 6th Flr
      Lake Oswego OR 97035
      Telephone:  (503) 598-7070
      david.bowser@jordanramis.com
      **DAVID H. BOWSER**
      OSB # 012098
      Two Centerpointe Dr 6th Flr
      Lake Oswego OR 97035
      Telephone:  (503) 598-7070
      david.bowser@jordanramis.com
      **Attorney(s) for Plaintiff Marine**
      **Industrial Construction, LLC**

*52733-73743 2493090_3\P/1/16/2017*



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, SEATTLE DISTRICT
P.O. BOX 3755
SEATTLE, WASHINGTON 98124-3755

REPLY TO
ATTENTION OF

**Civil and Operations Projects Branch**                    27 February 2015
**Contracting Division – Seattle District**

Marine Industrial Construction, LLC.
Attn:  Micheal Eakin   michaele@marineindust.com
9495 SW Wilsonville Rd
Wilsonville, OR  97070

Dear Mr. Eakin:

   This letter serves as notice that effective 27 February 2015, contract number W912DW-14-C-
0024, FY 14 Maintenance Dredging, Quillayute River Waterway, La Push, WA, is hereby
terminated for default in accordance with Federal Acquisition Regulation 52.249-10, Default –
Fixed Price Construction, April 1984.

   Per the terms of the contract you were to maintenance dredge the Quillayute River outer channel,
inner channel, and boat basin using the hydraulic process and to authorized widths and depths per
the plans and specifications in the contract. The contract was awarded 12 September 2014, including
all base and optional items, and work was to commence on the Notice to Proceed (NTP) date of 24
September 2014.  Work was to be completed no later than 11:59 p.m. on 28 February 2015.  Your
delay in commencing dredging, and your lack of measureable progress from the commencement of
dredging in November 2014 led to my issuance of a Cure Notice on 13 January 2015.  On 14
January 2015 the Government entered an interim unsatisfactory performance rating in CPARS due
to your lack of progress, to which you did not respond.  The failure to submit an acceptable plan to
recapture schedule and continued poor and dilatory performance after issuance of the Cure Notice
led to my issuance of the Show Cause letter dated 29 January 2015.  Continued poor and dilatory
performance leads to the decision to terminate.  The last Government survey performed 19 February
2015 shows only 10.5% of the estimated 79,000 cubic yards of material outlined in the contract has
been dredged.  You have failed to complete performance of the work required by the contract within
the period required under the contract.

   Your right to proceed further under this contract is terminated.  I have determined that your
failure to perform is inexcusable, and this notice of termination for default constitutes my decision.
You have the right to appeal this decision under the Disputes clause, Federal Acquisition Regulation
52.233-1, May 2014.

   The Government reserves all rights and remedies provided by law or under the contract, in
addition to entitlement to recovery from the Contractor and its sureties any increased costs incurred
by the Government in completing the work.

Exhibit 1
Page 1 of 2

The Government will withhold any further payments to the Contractor to protect the Government's interest.

Sincerely,

*Bonilie L. Lackey*

Digitally signed by
LACKEY.BONILIE.L.1110439659
DN: c=US, o=U.S. Government,
ou=DoD, ou=PKI, ou=USA,
cn=LACKEY.BONILIE.L.111043965
9
Date: 2015.02.27 13:02:39 -08'00'

Bonilie L. Lackey
Contracting Officer

CF:
Western Surety Company
Mark McKibbin, mark.mckibbin@cna.com
333 S. Wabash Ave.
Chicago, IL  60604

Durham and Bates Agency
Greg Ryerson,  greg@dbates.com
(503) 242-9405

Bond:  No. 929593489

Yuri Dyson yuri.dyson@sba.gov
Business Opportunity Specialist
U.S. Small Business Administration
620 SW Main Street, Suite 313
Portland, OR 97205
Ph: (503) 326-6692

pdxhelp@sba.gov

2

Exhibit 1
Page 2 of 2



**DEPARTMENT OF THE ARMY**
SEATTLE DISTRICT, CORPS OF ENGINEERS
PO BOX 3755
SEATTLE, WASHINGTON  98124-3755

April 15, 2016

CENWS-CT-C

Mr. David J. Bernert /Mr. Michael Eakin
Marine Industrial Construction, LLC.
9495 SW Wilsonville Road
Wilsonville, OR  97070

SUBJECT: Contract W912DW-14-C-0024, entitled FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014.

Dear Mr. Bernert:

This letter responds to your request for a Contracting Officer's Decision dated July 1, 2015, which was received by the US Army Corps of Engineers, Seattle District ("Government" or "USACE") on August 5, 2015 ("Request"). In accordance with FAR 52.233-1, this constitutes my Contracting Officer's Final Decision. The dispute applies to Contract W912DW-14-C-0024, entitled FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014 to Marine Industrial Construction, LLC ("MIC" or "Contractor").  In that Request, you asked for the sum of $638,260 and a time extension of 80.5 days as compensation for: delays associated with the contract award, delays and impacts related to miscellaneous debris encountered, delays and impacts due to clay-like material encountered in the basin, and delays and impacts associated with severe weather including high flows transporting logs which caused damage to equipment.

## PART I. SUMMARY OF THE CLAIM

1.  The request includes four elements:
    a.  Costs and delay days associated with the interval between the date the contract was awarded and the date the Notice to Proceed (NTP) was issued.
    b.  Costs and delay days associated with severe weather and high flows transporting logs which damaged equipment.
    c.  Costs and delay days associated with miscellaneous debris encountered during dredging causing clogged pipes and pumps.
    d.  Costs and delay days associated with differences in the characteristics of the material encountered during dredging.

2.  MIC asserts four general elements to support these claims:

Exhibit 2
Page 1 of 19

a. First, the contract included defective specifications because it required the use of hydraulic dredging which was not suitable for the circumstances. MIC asserts that the required use of hydraulic dredging in conjunction with weather events, logs in the river, encountering claylike material and encountering miscellaneous debris impacted their ability to make progress resulting in additional unanticipated costs and delays.

b. Second, MIC encountered differing site conditions in the form of unexpected miscellaneous debris, unexpected multiple wrecks, and unexpected logs floating in the river. Additionally, MIC asserts the characteristics of the material to be dredged differed from the material characteristics indicated in the contract documents. MIC asserts the differing site conditions they encountered while attempting to execute the contract requirements impacted their ability to make progress resulting in additional unanticipated costs and delays.

c. Third, the Government withheld vital information from the contract solicitation which was essential to the successful performance of the contract. The information withheld included notification of the existence of miscellaneous debris in the boat basin, notification relative to logs in the river, and the requirement for a minimum 12-inch diameter intake pipe. Additionally, MIC asserts that the Government possessed information relative to the clay-like nature of the material to be dredged that was not included in the solicitation documents. MIC asserts the information which was withheld from the solicitation documents caused them to submit a bid which did not adequately compensate for the costs of the work they were required to perform.

d. Fourth, MIC experienced delays which should have been excusable or compensable. These delays included a delayed start which pushed the work into a period of inclement weather; delays associated with encountering miscellaneous debris, and delays associated with encountering material with characteristics that differed from material characteristics indicated in the contract documents. MIC asserts that they are entitled to a time extension because of these excusable delays.

## PART II. CHRONOLOGY OF RELEVANT EVENTS

| Date | Event |
| --- | --- |
|  |  |
| July 25, 2014 | Solicitation issued |
| August 15, 2014 | Bidder Inquiry 5765858 |
| August 25, 2014 | Bid opening/due date |
| August 26, 2014 | Government sent letter to MIC asking for bid verification |
| August 28, 2014 | MIC sent letter in response verifying their bid. |
| September 1, 2014 | First day allowed by contract for dredging to commence in the Outer Channel |
| September 12, 2014 | Contract Award |
| September 22, 2014 | Bonds received from MIC |
| September 24, 2014 | Notice to Proceed |

Exhibit 2
Page 2 of 19

| October 1, 2014 | First day allowed by contract for dredging to commence in the Inner Channel |
| November 10, 2014 | All Pre-work Submittals Approved |
| November 10, 2014 | Started moving equipment to site. |
| November 18, 2014 | First dredging day per QC Reports |
| December 4, 2014 | Next dredging day per QC Reports |
| January 12, 2015 | Modification P00001 changed completion from 150-days after NTP (February 21, 2015) to February 28, 2015 |
| January 13, 2015 | Government sends Cure Notice |
| January 21, 2015 | Letter from MIC responding to Cure Notice |
| January 22, 2015 | Contractor Serial Letter 0001 – Notification of Differing Site Condition |
| January 29, 2015 | Government sends Show Cause Letter |
| February 5, 2015 | Letter from MIC Attorneys Responding to Cure Notice/Show Cause Letter |
| February 12, 2015 | Supplement to MIC Attorney's Response to Cure Notice/Show Cause Letter |
| February 27, 2015 | Termination for Default |
| February 28, 2015 | Last workday in fish window |
| August 5, 2015 | Certified Claim received by Government |

## PART III. RELEVANT CONTRACT CLAUSES, SPECIFICATIONS, AND OTHER CONTRACT DOCUMENTS

The following sources were used in preparing this response and are relevant to the claim:

### Contract Clauses and Specifications

- FAR 52.233-1, Disputes
- FAR 52.236-2, Differing Site Conditions
- FAR 52.236-3, Site Investigation and Conditions Affecting the Work
- FAR 52.236-15, Schedules for Construction Contracts
- FAR 52.243-4, Changes
- FAR 52.249-10, Default
- Special Clause SC-1, Commencement, Prosecution and Completion of Work
- Special Clause SC-2, Liquidated Damages
- Special Clause SC-3, Time Extensions
- Special Clause SC-6, Physical Data
- Contract Drawing – Plate O-3
- Specification Section 01 00 02, Paragraphs 1.8 and 1.14
- Specification Section 01 22 00, Paragraph 1.3.2
- Specification Section 01 33 00, Paragraphs 1.2.1, 1.4.1, and 1.10
- Specification Section 01 45 00.00 10, Paragraphs 1.9 and 3.2
- Specification Section 01 57 20.10 10, Paragraph 1.7, 1.8, 3.1, 3.6, and Attachment A, Water Quality Certification (WQC)(with enclosures)

Exhibit 2
Page 3 of 19

- Specification Section 35 20 23, Paragraphs 1.2 - 1.4, 3.2.6, and 3.2.9.

### Contract Administration Documents and Other Documents

- Dredged Material Suitability Determination dated January 6, 2011
- Public Notification of Intent to Dredge dated April 10, 2013
- Final Supplemental Environmental Assessment dated April 14, 2014
- Bidders Inquiry 5765858
- Standard Form 1442 submitted with MIC's bid and used to Award the Contract Government Serial Letter (GSL) dated August 26, 2014
- Contractor Serial Letter (CSL) dated August 28, 2014
- National Weather Service Weather Information Report September 1, 2004 through February 28, 2015
- Notice To Proceed, Effective on September 24, 2015
- Transmittal 01 00 02 3-3, submitted October 21, 2014 – Accident Prevention Plan
- Transmittal 01 57 20.00 10 1.1-1, submitted November 5, 2014 – Environmental Protection Plan
- Transmittal 35 20 20 1.1-1, submitted November 7, 2014 – Dredge Plan
- Transmittal 01 00 02 1.1-1, submitted November 10, 2014 – Initial Schedule
- Transmittal 01 45 00.00 10 1.1-1, submitted November 10, 2014 – Quality Control Plan
- Modification P00001 issued January 13, 2015
- Government Serial Letter dated January 13, 2015
- Contractor Serial Letter dated January 21, 2015
- Contractor Serial Letter dated January 22, 2015
- Contractor Serial Letter dated January 29, 2015
- Government Serial Letter dated January 29, 2015
- Contractor Serial Letter dated February 5, 2015
- Modification P00002 issued February 10, 2015
- Contractor Serial Letter dated February 12, 2015
- Modification P00003 issued February 27, 2015
- Contractor Serial Letter dated August 4, 2015 (MIC Claim)
- Government Serial Letter dated February 27, 2015
- Government Serial Letter dated September 28, 2015
- Contractor Quality Control (CQC) Reports - 49, 56, 58, 63-68, 72, 76, 77-81, 87-90, 92-95, 98, 101, 104-125, 132, 135-144, and 157
- Dredge Reports - 48, 53-72, 76-81, 87-90, 92-98, 104-120, 123-126, 132, 135-146, and 148
- Quality Assurance Reports – 1, 44, 48, 55, 62, 64, 70, 72, 76, 79, 81, 84, 86-91, 98, 102, 104, 105, 107, 112, 119, 122, 125, 126, 133, 140, 147, and 149

### PART IV.  FINDINGS OF FACT

3.   IFB W912DW-14-B-0008 Quillayute River Waterway, La Push, Washington ("Quillayute" or "Project") was issued on July 25, 2014, with a bid opening date of August 25, 2014.  Bidder

4

Exhibit 2
Page 4 of 19

Inquiry 5765858 was submitted by a bidder which provided information about project conditions including a warning to contractors bidding on the Contract cautioning them about "…water conditions that can change quickly due to weather and to be aware of trees coming down the river, debris and cobble."

4. MIC submitted their bid in response to the solicitation on August 25, 2014. Among other elements, MIC's bid included a "Price Guarantee" in block 17 of the Standard Form 1442 in which they agreed to perform the work required at the prices specified, in the time period allowed, if the offer was accepted by the Government in writing within 90 calendar days after the day the bid was submitted. The Government sent a letter to MIC dated August 26, 2014, asking MIC to verify their bid pricing. MIC responded in a letter dated August 28, 2014, verifying their bid price was valid. Their offer was accepted by the award of Contract W912DW-14-C-0024 on September 12, 2014, 18 days after the offer was made.

5. The awarded contract includes all base and optional bid items in the amount of $1,290,250. The general scope of work includes hydraulic dredging at Quillayute River Waterway, La Push, Washington, which is roughly divided into three elements: the outer navigation channel, the boat basin, and the inner navigation channel. The contract originally required all work be complete within 150 calendar days of Notice to Proceed ("NTP"). Block 12B on Standard Form 1442 indicates award of the contract required submission of performance and payment bonds within 10 days of award. The Government notified MIC in an e-mail and a letter dated September 12, 2014, that they had been awarded the Contract and that original payment and performance bonds are required before NTP can be issued. It also reiterated that the bonds are to be executed and sent to the Government as soon as possible but no later than 10 days after receipt by MIC. MIC submitted acceptable performance and payment bonds on September 22, 2014, 10 calendar days after award. By letter dated September 23, 2014 NTP was issued to be effective on September 24, 2014, two days after receipt of performance and payment bonds.

6. NTP became effective on September 24, 2014. Per the contract as originally awarded, the 150-day period of performance would have extended until February 21, 2014. By contract modification on January 13, 2015, the period of performance was extended to February 28, 2015, to allow for utilization of the entire "fish work window."

7. The Contract, as modified by Modification P00001, requires that all work be completed by February 28, 2015. Spec section 00 73 00, paragraph SC-1. This strict limitation delineating the performance period is compelled by environmental considerations in light of the life cycles of sensitive fish species and their prey. This limitation on dredging activity, commonly referred to as the "Fish Work Window," is imposed by extrinsic agencies. For like reasons, work could not commence in the outer channel earlier than September 1, 2014, or in the inner channel earlier than October 1, 2014 per Spec Section 35 20 23, paragraph 3.2.1.(a) and (b).

Exhibit 2
Page 5 of 19

8.  The Contract requires the use of hydraulic dredging for the work in each of the bid items in the bid schedule.  The mandated use of hydraulic dredging equipment is also prescribed in the Water Quality Certification appended as an Attachment to Specification Section 01 57 00.00.

9.  MIC was required by contract to provide submittals for government approval prior to the start of construction activities.  Section 01 33 00, "Submittal Procedures", paragraph 1.2.1 SD-01 "Preconstruction Submittals" clearly states submittals which are required prior to start of construction (work), includes, among other things: the Accident Prevention Plan (APP), the Construction Progress Schedule, the Dredge Work Plan, the Quality Control (QC) Plan, and the Environmental Protection Plan.  The Government is allowed 14 days to review these documents and return them to MIC per paragraph 1.11.1. Paragraph 1.10 "Scheduling", states that no delay, damages, or time extensions will be allowed for time lost due to late submittals.

10. The Government approved the Accident Prevention Plan (APP) on November 4, 2014, 14 days after it was submitted. The Government approved the Construction Progress Schedule on November 4, 2014, the same day it was submitted.  The Government approved the Environmental Protection Plan on November 5, 2014, the same day it was submitted.  The Government approved the Dredge Work Plan on November 7, 2014, the same day it was submitted. The Government approved the Quality Control (QC) Plan on November 10, 2014, the same day it was submitted.  The Government reviewed each of the required pre-construction submittals in less than the allowed 14 day review time.

11. The Contract requires, among other things, the Schedule be submitted by the contractor to the Government "within 10 days from notice to proceed," and must be approved prior to the start of construction.  Spec. 01 00 02, para. 1.2(c).   The Construction Progress Schedule was submitted on November 4, 2014, 41 days after NTP – 31 days late.  Notable in this schedule, MIC includes 7 days off at Thanksgiving, 5 days off for Christmas, and 5 days off for New Years.  The schedule includes 6-day workweeks.

12. MIC started moving equipment to the site on November 10, 2014, and performed its first partial day of dredging on November 18, 2014.  The Quality Control ("QC") report for that day states that Dredging was performed from 1436 to 1800 hours.  From November 25, 2014 to December 1, 2014, pursuant to their submitted schedule, MIC took a 7 day break for Thanksgiving.

13.  Paragraph SC-1(a) of Specification Section 00 73 00 requires the Contractor to "be mobilized and ready to commence dredging within 28 calendar days" after receipt of NTP, which would have been October 22, 2014.  MIC commenced dredging on 18 November 2014 - 27 days late.

14. The next day on which the Quality Control reports indicate dredging occurred was December 4, 2014.  According to the dredge reports submitted by MIC, employees

Exhibit 2
Page 6 of 19

returned to work on December 2, 2014, but no dredging occurred again until December 4, 2014.

15. The contract specifically states that "each bidder shall be satisfied before submitting his bid as to the hazards that are likely to arise from weather conditions." Spec. 00 73 00, paragraph SC-6(b). It likewise states that the government will not undertake to keep the channel free from vessels or other obstruction. Id. at (f)(emphasis added). The Contract further states that the contractor may encounter accumulations of forest trash, sunken logs, stumps, and miscellaneous debris. Spec. 35 20 23, para 1.3.

16. On December 8, 2014, MIC reported to the Government that dredging had been slowed by material sloughing back. MIC also stated that it intended to continue working through the current storm, and had installed storm anchors.

17. The first time the QC reports note weather as a cause of delay is December 8, 2014. QC reports note that weather caused delay from December 8, 2014 until December 13, 2014. Again from December 19, 2014 until December 22, 2014, the QC reports note no dredging due to weather and "the subsequent impacts of severe weather".

18. On December 16, 2014, during a conference call with the Government, MIC reported that it was not using a booster pump for the outfall pipe because the booster pump was broken.

19. On December 30, 2014, the QC reports note the first day of dredging since December 23, 2014. MIC started dredging in the Boat Basin on December 23, 2014. On January 2, 2015, both the Toyo and the Mudcat were utilized for the first time. The last report of the Mudcat on site is on January 27, 2015.

20. The QC reports from January 5, 2015 through January 8, 2015 indicate that weather caused delay, but without narrative. These reports reference Dredge Reports for additional information. However, these Dredge Reports indicate that MIC crews were working during these days. There is no mention in the QC reports of delays caused by debris encountered during these days. However, there are scattered reports starting on December 30, 2014 that some equipment encountered various debris. Only two QC Reports use the word "delay" outside the weather block: January 2, 2015, and February 26, 2015.

21. USACE sent MIC a Cure Notice on January 13, 2015, related to its failures to make adequate progress. Shortly after this letter, for the first time on January 22, 2015, MIC notified the government that it believed it had encountered a differing site condition in the Boat Basin. In this letter, MIC states that it believes that the items encountered are 'artificial obstructions' in the boat basin as opposed to debris. MIC also asserts that Spec 35 20 23, para 1.3 refers to the encountering of woody debris, and fine silts to cobbles. Also for the first time in this letter, MIC states that the material encountered in the boat basin was a more compacted clay-like material than had been stated in the contract.

Exhibit 2
Page 7 of 19

22. The Government Issued a Show Cause letter on 29 January, 2015. On February 27, 2015, 156 days after NTP, the Government terminated the contract for default after MIC dredged merely 13,011 cubic yards (cy), or approximately 16% of the total estimated course of work of 79,000 cy from the outer channel, inner channel, and boat basin.

## PART V. ANALYSIS

23. In general, MIC's claim is based on the following interpretations of the contract documents:

    a.  The MIC claim for the delayed start date is based on the rationale that because the fish work window opened on September 1, 2015, the Contractor was harmed by the fact that the contract was not awarded until September 12, 2014. MIC asserts that the late award and that NTP was not issued until September 24, 2014 pushed the work into a period of inclement weather that they would not have otherwise encountered. This caused them to suffer impacts and delays. MIC asserts this delay caused them to lose 37 working days which should be excusable.

    b.  MIC interprets the contract documents to indicate that MIC will be reimbursed for costs incurred and that the contract duration will be extended because they are subject to unusual weather events, including damage to equipment that results from logs floating down the river. MIC asserts that there were seven unusually severe weather events during the project which required them to stop work and which caused logs to float down the river and damage equipment. MIC asserts that the Government is liable for 30 days and $170,073 in costs related to severe weather events encountered.

    c.  MIC asserts the contract states that they would only encounter limited natural woody debris, no artificial obstructions, no wrecks, no wreckage, and no other materials that would impact hydraulic dredging. MIC asserts that the debris they encountered constitutes a differing site condition. MIC asserts that is it entitled to 20 days and $178,612 in costs related to debris encountered in the boat basin.

    d.  MIC asserts that the contract documents indicate that materials ranging from cobbles to fine silts would be encountered during dredging and that the material encountered in the boat basin was much more clay-like. MIC asserts that the description "cobbles to fine silts" does not include clay. MIC interprets the contract documents to mean that they would not encounter any clay in the material to be dredged. MIC asserts that it is entitled to 30.5 days and $289,575 in additional costs for efficiency delays caused by what it calls "clay like material."

    e.  MIC asserts that since the contract documents required dredging be performed using hydraulic equipment, the documents provided an implied warranty that the work could be performed using *any* hydraulic dredging equipment. MIC asserts that

Exhibit 2
Page 8 of 19

hydraulic dredging was not suitable for the weather events, floating logs, debris, or for the type of material to be dredged. MIC asserts this generally as a basis for its specific claims above.

f.    Additionally, MIC asserts that the Government possessed superior knowledge and failed to disclose to MIC information that was otherwise unavailable. This information included required minimum pipe size; warnings about currents, precipitation, and flow; warnings about logs that move with the current; and warnings about miscellaneous debris. MIC asserts that the Government's failure to provide this information generally as a basis for its specific claims above.

24. Delayed Start

a.    MIC asserts that they are entitled to an extension of the contract duration due to the allegedly late date the contract was awarded and due to the allegedly late date that Notice to Proceed (NTP) was issued. MIC notes that NTP was provided on September 24, 2014, and related to that date, the earliest work should have commenced on or about October 8, 2014. MIC asserts that late award and NTP pushed the start of work 37 days into a period of inclement weather that they would not have otherwise encountered, which caused them to suffer impacts and delays.

b.    MIC is correct that there was a delay in the start of work. However, that delay is entirely the fault of MIC. The Government had 90 days to award the contract under the terms of MIC's bid. The contract was awarded on September 12, 2014, and MIC provided the bonds required for NTP on September 22. NTP was issued on September 24, 2014. There was no delay caused by the government in this process.

c.    Furthermore, the Contract requires completion of all work not later than 150 days following NTP. Because the Government awarded and issued NTP by September 24, 2014, MIC still had 150 days to perform before the end of the Fish Work Window – in fact, they ultimately had 157 days. Therefore, the fact that NTP was issued on September 24, 2014 did not impact the opportunity for MIC to perform the course of work within the prescribed interval, and complete prior to the close of the Fish Work Window, pursuant to the terms of the contract.

d.    Most importantly, MIC does not explain why, then, if the better weather days were of such a concern, that MIC did not finish submitting its prework submittals until November 10, 2014 – 47 Days after NTP.

e.    Paragraph 1.2(c) of Specification Section 01 00 02 states that the Construction Progress Schedule shall be submitted within 10 calendar days after receipt of notice to proceed. The Progress Schedule was submitted by MIC 47 calendar days after NTP, on November 10, 2014. It was approved by the Government on the same day.

Exhibit 2
Page 9 of 19

f.   Paragraph 1.18(a) of Specification Section 01 00 02 states that the Accident Prevention Plan shall be submitted within 14 calendar days after receipt of notice to proceed.   The Accident Prevention Plan was submitted by MIC 27 days after NTP, on October 21, 2014.  It was approved by the Government on November 4, 2014 fourteen days after submittal, which was before MIC had even presented any of the other required submittals to the Government.

g.   Paragraph 3.2 of Specification Section 01 45 00.00 10 states that the Contractor Quality Control (CQC) Plan shall be submitted within 14 calendar days after receipt of notice to proceed.   The CQC Plan was submitted by MIC 47 calendar days after NTP, on November 10, 2014.  It was approved by the Government on the same day.

h.   Paragraph 1.7 of Specification Section 01 57 20.00 10 states that the Environmental Protection Plan (EPP) shall be submitted prior to commencing dredging operations and delivery of equipment to the site.  Paragraph 1.2.1(k) and Paragraph 1.4.1(k) of Specification Section 01 33 00 state that the EPP must be approved prior to the start of construction (work).  The EPP was submitted by MIC 42 calendar days after NTP, on November 5, 2014.  It was approved by the Government on the same day.

i.   Paragraph 1.2 of Specification Section 35 20 23 states that the Dredge Work Plan (DWP) shall be submitted within 14 calendar days after receipt of notice to proceed.  The DWP was submitted by MIC 44 calendar days after NTP, on November 7, 2014.  It was approved by the Government the same day.

j.   By the terms of the contract, MIC was supposed to submit these documents within 14 days after NTP which they failed to do.  The Government then had 14 days to review each. The Government conducted the review of all submittals within that timeframe and as of the same day that the last submittal was delivered to the Government (November 10, 2014).

k.   Special Clause SC-1 in Section 00 73 00 states that work shall commence within 14 calendar days after the date the Contractor receives the NTP, and the Contractor shall be mobilized and ready to commence dredging within 28 calendar days after the Contractor receives NTP.  MIC was not ready to commence dredging until November 18, 2014, 55 days after notice to proceed.  MIC dredged for 3 hours and 24 minutes on November 18, 2014 and then shut down operations for its Thanksgiving break and did not dredge again until December 4, 2014, 71 days after NTP.  To put it another way, in the first 72 days after NTP, the contract required MIC to have completed up to 44 days of dredging.  MIC had completed less than 2.

l.   MIC elected to protract the contract performance start-up process through dilatory submission of bonds and untimely presentation of the required submittals, in violation of the contract's terms.  The Government's turnaround in review and approval of submitted documentation, on the other hand, was prompt and fully

Exhibit 2
Page 10 of 19

compliant with the applicable review and approval intervals prescribed by the contract.

m.  Accordingly, MIC's request for a time extension due to alleged delay in awarding the contract and in issuing NTP has no merit.  USACE awarded the contract and provided NTP within reasonable timeframes that fell within the intervals contemplated and prescribed by the contract's terms.  MIC did not comply with the contract requirements relative to mobilization and submittals, and delayed themselves significantly in starting the work.

n. Any delay that was encountered from the date of award until commencement of dredging was under the exclusive control of and fell within the sole responsibility of the contractor.  Moreover, subsequent to commencement of dredging, elective periods spent not dredging, such as the interval between November 18 and December 4, 2014, for example, are under the exclusive control of and fall within the sole responsibility of the contractor.

25. Unusually Severe Weather and Wood Debris:

a.  MIC asserts that there were seven unusually severe weather events during the contract period which required them to stop work, and which caused logs to float down the river and damage equipment. The Government notes that the first of these weather events occurred over MIC's pre-planned Thanksgiving break.  MIC claims that they are due the costs incurred and an extension of the contract duration for these occurrences.

b.  For the reasons stated below, MIC encountered neither unusually severe nor unforeseen weather events. Further, the encountering of wood and other forest trash was both a foreseeable occurrence and was explicitly expressed in the terms of the contract.

c.  Paragraph (a)(3) of FAR 52.236-3, incorporated into the contract, states MIC acknowledges it has taken reasonably necessary steps to ascertain the nature and location of the work, and it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost including uncertainties of weather, river stages, tides, or similar physical conditions at the site.  Any failure of MIC to take the actions described and acknowledged in this paragraph does not relieve MIC from the responsibility for estimating properly the difficulty and cost of successfully performing the work considering uncertainties of weather, river stages, and tides.

d.  Paragraph (b) of Special Clause SC-6 in Section 00 73 00 of the contract states that each bidder shall be satisfied before submitting his bid as to the hazards likely to arise from weather conditions and that complete weather records and reports may be obtained from any National Weather Service Office.  Paragraph (f) of that same Special Clause SC-6 provides that the Government will not undertake to keep the channel free of obstructions.

Exhibit 2
Page 11 of 19

e.   Paragraph 1.3 of Specification Section 35 20 23 informs MIC that they may encounter, as "material to be removed," accumulations of forest trash, sunken logs, stumps, and "miscellaneous debris." This contractual language placed MIC on notice to expect logs and other woody debris to be encountered in the course of dredging. Further, as MIC accurately notes, large accumulations of wood and other forest trash were clearly visible immediately upstream of the project area.

f.   Information from the National Weather Service, publicly accessible on their website and specifically referenced in FAR 52.236-3(a)(3) as well as in Paragraph SC-6(b) of Specification Section 00 73 00, shows that the weather experienced during the contract period was not unusually severe when compared with weather during corresponding periods over the previous nine years. The Quillayute River Basin has in several recent years experienced more severe weather and more frequent severe weather events than occurred during the 2014 – 2015 contract period.

g.   Information obtained from the United States Geological Survey (USGS) website which is also publicly accessible likewise indicates that based on averages, river flows on the Quillayute River were not unusually severe when compared with river flows on the Quillayute River over the previous 14 years.

h.   Further, Bidders Inquiry 5765858 submitted prior to MIC's bid and acknowledged by all the other bidders, including MIC, points out that in previous solicitations, contractors had been explicitly warned about water conditions that can change quickly due to weather and warned to be aware of trees coming down the river. This information was noted by the Contracting Officer, and provided pre-bid to offerors, further information of the existence of River flow conditions and floating debris to be encountered at the work site.

i.   The Quillayute River is a coastal river, frequently subject to large flow variances which would be expected to collect and transport debris both from the heavily forested areas upriver and from the adjacent shoreline during elevated flows. An examination of the river banks across from and immediately upstream of the project give an indication of the many large logs and other types of wood debris that will be mobilized during high flows. A reasonably experienced dredging contractor who has with due diligence familiarized himself with the local conditions would be cognizant that there will be many logs and other pieces of wood debris which he will be required to manage in the course of dredging.

j.   Average flows on the River routinely reach above 10,000 cubic feet per second (cfs). Periodic events above 15,000 cfs also often occur and should have been reasonably anticipated from readily available weather data. Nothing about the flow conditions actually encountered during the 2014-15 performance period were substantively different than what should have been anticipated and planned for.

Exhibit 2
Page 12 of 19

k.   For the years 2000 -2015, the average number of days during the corresponding period of time (September 1 through February 28) with flows above 10,000 cfs was 28.6, with a min/max variation of 7 days to 59 days.  Flows above 15,000 cfs averaged 13.47 with a min/max variation of 3 days to 26 days.    For the 2014-2015 season during the period September 1 through February 28, 33 days saw flows above 10,000 cfs, and 17 days saw flows above 15,000 cfs.  These actual totals are only marginally above the 14-year average, and still well within the range that a reasonable contractor with the information publically available and provided through the contract specifications and the bid preparation process should have anticipated.

l.   MIC readily points out that ample information was available, including aerial photos, as well as information visually ascertainable from their site visit, that there were large amounts of wood, debris, and other forest trash accumulating in and just upstream of the project area.  MIC does not dispute that they were aware of this debris, or the potential impact it could have.  Instead, they assert that they did not believe that this debris would become dislodged, excepting in "unusually severe weather" events.

m.  This is an unreasonable position, for two reasons.  First, as discussed immediately above, this conclusion rests on the unfounded assertion that the weather events encountered were "unusually severe."  The elevated flow events did not materially differ from typical seasonal conditions.  Second, MIC has failed to demonstrate, given ample physical evidence of a dynamic channel laden with forest debris, that a reasonable, competent member of the dredging industry would anticipate that this debris would only become waterborne in an unusually severe weather event.  MIC has not presented any rational foundation for the contention that it did not expect to encounter floating wood debris in the lower reaches and mouth of the Quillayute River during a performance period that spanned the late fall and winter months.  MIC has not demonstrated that the floating wood actually encountered during the performance presented a materially differing site condition.

n.   Accordingly, MIC's request for compensation of costs and an extension of the contract duration as the result of unusually severe weather events including floating logs during dredging is found to be without merit.  The contract documents and associated available information notified potential bidders of the potential for weather events.  The weather events that occurred during the contract period were not unusually severe.  Any prudent bidder who is experienced in dredging would be cognizant that a location at the mouth of a river opening into the ocean is subject to storms during the winter.  Logs and woody debris were visible on all the river banks within line of sight of the project area.  Additionally, MIC does not provide any documentation supporting their assertions that unusually severe weather impacted the critical path of their progress schedule.

26. Differing Site Condition – Dredge Materials:

a.   MIC asserts that the material dredged in the boat basin had different characteristics than the material characteristics identified in the contract documents because the

13

Exhibit 2
Page 13 of 19

material encountered in the boat basin was more "consolidated clay-like" sediments than they anticipated.

b.   Paragraph 1.3 of Specification Section 35 20 23 states that the material to be dredged "is composed of cobbles to fine silts." The appropriate reference on soil particle sizing is ASTM Standard D 2487-92, which is the ASTM version of the Unified Soil Classification System (USCS). The USCS is widely accepted for engineering purposes. ASTM Standard D 2487-92 sizes particles from "Cobbles" to "Fine grained Soil." In ASTM Standard D 2487-92 both clay and silt fall under the classification of "Fine grained Soil."

c.   Attachment A to Specification Section 01 57 20.00 10 is the Water Quality Certification (WQC) for the project. Paragraphs 1.8 and 3.1 of Specification Section 01 57 20.00 10 specifically state that MIC must comply with the conditions of the WQC. The WQC directs offerors to the Draft Supplemental Environmental Assessment and the "Dredged Material Suitability Determination." Both these documents are publicly available documents through the Government's website. Both documents include sampling results which indicates that the sediments to be dredged should be anticipated to contain 7% clay in the Boat Basin. The Government performed additional analysis of the boat basin material in undredged areas after MIC had left the project. The results of this analysis confirm the material characteristics identified in the Draft Supplemental Environmental Assessment and the Dredged Material Suitability Determination are accurate, and the dredgeability of the fine-grained sediment material is unaffected by the minor presence of clays.

d.   MIC fails to provide compelling arguments that the existence of clay materially impacted their production rate. MIC merely broadly compares their production at this site with alleged production on other projects. That type of comparison is not sufficient because it is impossible from the information provided to ascertain the differences in conditions at the sites, types of material, configuration of equipment, and other factors that may contribute to production rate differences. Information provided relative to production rates at other sites is purely anecdotal and is not substantiated by any supporting documentation. Moreover, even if a difference in production rate had been adequately established, MIC fails to demonstrate that the composition of sediments was the proximate cause of such low production rate, nor that the sediment composition was materially different than that described in the contract specifications.

e.   MIC also provides no actual information about the specific material encountered, except to merely assert their makeup. MIC asserts the presence of clay, but provides no evidence to support their claim.

f.   Furthermore, the mere presence of clay particles is not itself probative. The presence of a small amount of clay is specifically mentioned in the documents incorporated to the contract by reference. The presence of clay, without assessment of its dredgability has no merit. The dredgeability of the material can only be determined by tests such as Standard Penetration Tests, vane shear testing, and triaxial compression

Exhibit 2
Page 14 of 19

testing.  The presence of some quantities, deposits, or lenses of clay would not have a materially adverse effect on the ability of the contractor to dredge shoaled material.

g. FAR 52.236-2 requires that MIC provide written notice to the Contracting Officer when differing site conditions are encountered.  MIC began dredging in the boat basin on December 23, 2014. However, MIC did not provide written notice to the Contracting Officer of what it now asserts was a differing site condition until January 21, 2015.  The written differing site condition notice was given 29 days after dredging started in the boat basin and, notably, only one week after MIC received a "Cure Notice" from the Government.

h.  Accordingly, MIC's request for compensation of costs associated with encountering clay-like material as a differing site condition during dredging is found to be without merit.  MIC did not encounter subsurface conditions which differed materially from those indicated in the contract nor did MIC encounter unknown physical conditions at the site of an unusual nature which differ materially from those ordinarily encountered in the area.

27. Differing Site Condition - Miscellaneous Debris:

a.  MIC asserts that they only expected to encounter limited natural woody debris, no artificial obstructions, no wrecks, no wreckage, and no other materials that would impact hydraulic dredging.  MIC asserts that the debris and the "wreckage" they allegedly encountered constitute a differing site condition.

b.  In support of this point, MIC interprets paragraph 1.4 of Specification Section 35 20 23 to warranty that no "artificial obstructions" would be encountered.   The Government also notes that a plurality of the instances of debris encountered were either of unknown origin or included "woody debris."

c.  Paragraph 1.3 of Specification Section 35 20 23, entitled "Material to be Removed," informs MIC that they may encounter, among other things, "forest trash" and "miscellaneous debris."  MIC attempts to interpret this phrase as only including limited "natural woody debris."  However, the category of "miscellaneous debris" is not qualified by any reference to "natural" or "wood" objects, as MIC claims. "Miscellaneous debris" cannot reasonably be interpreted to be limited this way or to mean anything other than assorted refuse which could be of various natural and anthropogenic types.    This specification section also informs MIC that bidders are expected to examine the site of work and verify the character of materials prior to submitting offers.

d.  MIC also misinterprets Paragraph 1.4 of Specification Section 35 20 23 by excluding several key words.  This section informs MIC that the Government is not aware of artificial obstructions that would require <u>additional equipment</u> for <u>economical removal</u>.  MIC, in their request for COD, conflates the terms "debris" and "obstructions" and attempts to interpret this phrase as stating that a contractor should

Exhibit 2
Page 15 of 19

not expect to encounter *any* miscellaneous debris.  This is not a supportable interpretation of paragraph 1.4.  MIC's interpretation contradicts other language in the contract, readily available and observable information, and industry practice.

e.   Paragraph 1.4 of Specification Section 35 30 23 does not warranty a project site completely free of "artificial obstructions."  The specification states that the Government has no knowledge of obstructions such as cables or pipes - *that will require additional equipment for economical removal*.  It does not say that no obstructions will be encountered, period, as MIC would assert.  The clause states none are known that will require different or additional facilities to remove.  Reading this clause in relationship to the other terms and specs, instead of in the vacuum which MIC requests, it is clear that if MIC had brought equipment that would have been adequate to dredge the material and remove the debris (including wood, stumps, and other miscellaneous debris) listed in section 1.3, it would have required no additional equipment to deal with any boat basin obstructions which it encountered.  For instance, paragraph 1.3 of Specification Section 35 30 23 places the Contractor on notice that materials such as "sunken logs" may be encountered and must be removed.  The same crane or similar equipment that would be required to remove sunken logs would also be sufficient to remove and properly dispose of objects of sunken miscellaneous debris, whether found in the channel proper or in the boat basin.  MIC has not demonstrated that there was any object or material encountered that would not be reasonably and properly categorized as "miscellaneous debris" under paragraph 1.3 of Specification Section 35 20 23, nor that there was any object – artificial or otherwise – encountered that could be considered an "obstruction" which would not have been removed with use of the same equipment needed to extract and dispose of the sunken logs and other assorted objects specified in paragraph 1.3.

f. Not only does paragraph 1.3 of Specification Section 35 20 23 unequivocally advise that "miscellaneous debris" will be found in the "material to be removed," at several other points in the contact it is noted that MIC will either encounter or need to dispose of debris.  For example, Paragraph 1.3.2 of Specification Section 01 33 00 notifies MIC that no separate payment will be made for the disposal of debris and that it shall be considered as incidental to dredging operations.  The inclusion of this statement in the contract implies that MIC should expect to encounter debris which would require disposal.

g. Another provision, in Paragraph 3.6.1 of Specification Section 01 57 20.00 10, notifies MIC that solid wastes must be placed in containers that are emptied on a regular schedule.  The inclusion of this statement in the contract also implies that MIC should expect to encounter debris which would require appropriate disposal.

h.   An experienced competent dredging contractor expressly informed that a portion of the dredging is within an existing marina, especially after making a site visit, could not reasonably conclude that no anthropogenic material associated with the historical activities in the marina would be found in the material to be dredged.  At the time of the site visit there was at least one boat wreckage visible above the water surface in a slip

adjacent to the dredge area. The existence of miscellaneous debris in the water and scattered upon the beach was readily apparent when MIC conducted the site visit.

i. Accordingly, MIC's request related to debris encountered in the boat basin has no merit. The contract documents and associated information notified potential bidders of the existence of miscellaneous debris. The existence of miscellaneous debris at the site including boat wreckage was visible at the time the site visit was conducted. Any prudent bidder who is reasonably experienced in dredging would be cognizant that a marina would present miscellaneous debris requiring removal.

28. Hydraulic Dredging Unsuitability:

a. MIC's assertion that hydraulic dredging is unsuitable for this project is meritless. MIC asserts that hydraulic dredging is inappropriate for the conditions that exist at the mouth of the Quillayute River and since hydraulic dredging is inappropriate, the requirement constitutes a defective specification.

b. Paragraph (a) of FAR 52.236-3 states that the Contractor acknowledges that it has taken reasonably necessary steps to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost including the character of equipment and facilities needed preliminary to and during work performance.

c. None of the conditions to which MIC buoys its defective specification argument are latent or concealed, as discussed previously. If MIC therefore believed the specification mandating the use of hydraulic equipment to be defective, it was free to raise that issue prior to award, or refuse to bid. Here, MIC did neither. Any failure of MIC to raise its concerns prior to bidding does not relieve MIC from the responsibility for estimating properly the difficulty and cost of successfully performing the work, or the responsibility for proceeding to successfully perform the work without additional expense to the Government.

d. It is clear that the types and numbers of components of a hydraulic dredging system that MIC mobilized and devoted to the task were a dismal failure. Only approximately 16% of the prescribed course of performance was achieved over a period of over five months. This was caused both by failures of MIC to diligently pursue the work, and their failures to provide adequate means and methods to perform the task. While MIC implicitly acknowledges the inadequacy of their own equipment to complete the work at hand, it does not logically follow that there is no hydraulic dredging equipment available that could successfully perform this work. To that point, MIC correctly relates in their request for COD that hydraulic dredging *has* been successfully performed in the Quillayute Waterway in 2002, 2007, 2009, and 2011.

e. Although the Government need not justify its prescription of a performance methodology through articulating its underlying rationale, in order to defend a defective specification challenge, the use of hydraulic dredging methodology was dictated by the

17

Exhibit 2
Page 17 of 19

need for placement of dredged material for beneficial use in a particular location and manner, which in turn was dictated by environmental considerations and imposed by extrinsic agencies. See, for example, the Water Quality Certification appended to Specification Section 01 57 20.00.

    f.   Accordingly, MIC's assertion that the requirement for hydraulic dredging was a defective specification is without merit.

29. Superior Knowledge:

    a.   In the foregoing sections, the Government has outlined how none of the material and relevant conditions encountered by MIC should have been unanticipated to MIC or a reasonable contractor. However, MIC asserts not only that this information wasn't available, but that the Government possessed superior knowledge of information related to these and failed to disclose them to MIC. As has been discussed above, these claims are without merit, because MIC should have been aware of the material conditions it encountered.

    b.   Included in this claim are five specific allegations: required minimum pipe sizing; warnings about currents, precipitation, and flow; warnings about logs that move with the river flows; warnings about miscellaneous debris; and the clay-like texture of the material to be dredged. MIC asserts that the Government withheld records of previous dredging, sediment analyses, and current condition surveys. Each of these claims is incorrect, unfounded, or both. MIC knew or should have known about each of these conditions and their assertions about minimum pipe size as it relates to site conditions is incorrect.

## PART VI. CONCLUSION

    MIC has failed to satisfactorily demonstrate any entitlement to additional time or compensation.

    Therefore, based on the preceding information and analysis, it is my final decision that the Contractor's claim for an equitable adjustment is found to be without merit. Accordingly, the claim is hereby denied in its entirety.

## PART VII.  RIGHT TO APPEAL

    This is the final decision of the Contracting Officer. This decision may be appealed to:

    Armed Services Board of Contract Appeals
    Skyline Six, 5109 Leesburg Pike, 7th Floor
    Falls Church, VA  22041-3208

Exhibit 2
Page 18 of 19

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's—

(1) Small claim procedure for claims of $50,000 or less *or, in the case of a small business concern (as defined in the Small Business Act and regulations under that Act), $150,000 or less*; or

(2) Accelerated procedure for claims of $100,000 or less.

Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision. I note that MIC has likely already made this election, by filing a complaint before the Court of Federal Claims for related claims on 13 October 2015.

Sincerely,

BONILIE L. LACKEY
Contracting Officer



**DEPARTMENT OF THE ARMY**
SEATTLE DISTRICT, CORPS OF ENGINEERS
PO BOX 3755
SEATTLE, WASHINGTON  98124-3755

December 21, 2016

CENWS-CT-C

Mr. David J. Bernert
Marine Industrial Construction, LLC.
9495 SW Wilsonville Road
Wilsonville, OR  97070

SUBJECT: Contract W912DW-14-C-0024, FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014, Contracting Officer Final Decision on Reprocurement Costs and Demand for Payment.

Dear Mr. Bernert:

The United States Army Corps of Engineers, Seattle District ("Government" or "USACE") hereby demands payment in the amount of $1,031,751.50 from Marine Industrial Construction, LLC ("MIC") for MIC's failure to perform the work associated with the above referenced contract.  In accordance with FAR provision 33.211 and Subpart 32.6, this constitutes my Contracting Officer's Final Decision on Reprocurement Costs and Demand for Payment in this matter.

## PART I. SUMMARY OF THE DEMAND

1.  The demand for payment includes two elements:
  a.  Increased costs of the repurchase amount of the follow-on contract. This includes the administrative costs associated with the reprocurement of the requirements from another source.
  b.  Liquidated Damages.

2.  First, the Government demands $409,345.50 in increased cost to the Government to obtain performance under the follow-on contract itself.  In the above referenced terminated contract, MIC agreed to perform all work to achieve the required channel and marina dredged prisms, for the amount of $1,290,250, of which $416,000 was paid to MIC.  A follow-on contract to perform the identical dredged prism was completed at a cost to the Government of $1,283,595.50.  MIC owes the Government the amount it cost to repurchase the requirements MIC agreed to perform.  This net difference is $409,345.50 (Amounts paid to MIC, plus the amount paid for the follow-on contract, minus the original contracted amount).

Exhibit 3
Page 1 of 7

SUBJECT: Contract W912DW-14-C-0024, FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014, Contracting Officer Final Decision on Reprocurement Costs and Demand for Payment.

3.   Second, the Government demands payment of its administrative costs of soliciting and securing the reprocurement contract.  These costs total $271,006. These are the costs solely attributable to the Government effort to obtain a follow-on contract to fulfill the requirements that MIC failed to perform.  This amount does not include the amounts spent to close out the above referenced terminated contract, nor does this amount include the amounts expended in administration of the follow-on contract.  The reprocurement was for the same requirement using substantially the same contracting method.  Competition was obtained to the maximum extent practicable.

4.   Third, the Government demands liquated damages, pursuant to the contract, for 251 days in the total amount of $351,400.

## PART II. RELEVANT CONTRACT CLAUSES, SPECIFICATIONS, AND OTHER CONTRACT DOCUMENTS

5.   Contract Clauses

   a.   FAR 52.249-10, Default
   b.   FAR 52.232-17, Interest
   c.   FAR 52.233-1, Disputes
   d.   FAR 52.243-4, Changes
   e.   FAR 32.604, Contract Debts - Demand for Payment
   f.   Special Clause SC-1, Commencement, Prosecution and Completion of Work
   g.   Special Clause SC-2, Liquidated Damages

6.   Contract Administration Documents and Other Documents

   a.   Government Serial Letter dated February 27, 2015

## PART III.  FINDINGS OF FACT

7.   The above referenced contract was awarded to MIC on September 12, 2014, in the amount of $1,290,250.  The contract included the clauses referenced above in Part II.  The contract also included Special Clause SC-2, "Liquidated Damages – Construction."

8.   Special Clause SC-2 for this contract stated, in its entirety:

> (a) If the Contractor fails to complete the work within the time specified in the Contract, or any extension, the Contractor shall pay to the Government as liquidated damages, the sum of $1,400.00 for each day of delay until the work is completed or accepted.

> (b) If the Government terminates the Contractor's right to proceed, the resulting damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess cost of repurchase under the Termination clause of the CONTRACT CLAUSES.

Exhibit 3
Page 2 of 7

SUBJECT: Contract W912DW-14-C-0024, FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014, Contracting Officer Final Decision on Reprocurement Costs and Demand for Payment.

9.  Liquidated Damages for this contract were set at the amount of $1,400 "for each day of delay" until the work is completed, without any exception.  Further, these amounts are "in addition to excess costs of repurchase."

10. The contractually required period of performance at the time of contract award was 150 days. MIC was ultimately given 156 days to perform the contract before the contract was terminated, but MIC failed to complete any significant amount of the required work.

11. By Decision of the Contracting Officer, dated 27 February 2015, MIC's right to proceed under the above referenced contract was terminated for default.

12. Because of MIC's default in the performance of the contract, the Government incurred significant additional costs in the reprocurement of the follow-on contract.

13. The termination letter also reserved to the Government all rights and remedies available to it under law or contract, in addition to entitlement to recovery from the Contractor and its sureties any increased costs incurred by the Government in completing the work.

14. The seasonal work window (commonly called the "fish window") ended on 28 February, 2015, and did not open again until 1 September 2015.  This environmentally-based work window was extrinsically imposed on the Government, thus precluding any dredging and disposal work during this interval.

15. Because of MIC's failure to complete the project before 28 February 2015 as required by the Contract, the Quileute Nation and the United States Coast Guard irreparably lost significant use of the boat basin and channel until the work could be completed.

16. Because of MIC's failure to complete the project as required by the Contract, the Corps incurred significant additional costs in the continued administration of the follow-on contract.

17. The follow on contract, W912DW-15-C-0011 was awarded on August 27, 2015, following an Invitation for Bids.  The final contract price for this contract was $1,283,595.50. Because of MIC's paltry effort in completing the work the year prior, rework by the follow-on contractors was required.

18. The follow-on contractor was given a 150-day period of performance to complete the contract. The Contractor used a total of less than 65 days, completed the in-water construction portions of the work with less than 28 days of dredging activity, and demobilized on  November 6, 2015.

19. The follow-on contractor's diligent performance of the work saved considerable effort on behalf of the Government, and ultimately saved MIC considerable costs in liquidated damages.

Exhibit 3
Page 3 of 7

SUBJECT: Contract W912DW-14-C-0024, FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014, Contracting Officer Final Decision on Reprocurement Costs and Demand for Payment.

# PART IV. ANALYSIS

20. FAR 49.402-6 states that where a contractor is terminated for default and the item is still required, the Contracting Officer shall repurchase those items against the contractor's account. The Government here used the sealed-bid process again, to ensure adequate competition for the follow-on contract.

21. After the completion of the contract and after final payment and release of claims, I determined the total amount of the reprocurement contract to be $1,283,595.50. I took into consideration all increases and decreases in all costs required to meet the performance required under MIC's initial contract.

22. FAR 49.402-7(b) states that in addition to the reprocurement costs, the Government may make a demand for additional administrative costs incurred as a result of the contractor's default.

23. The Government separated its costs for the closeout of the above contract from the costs associated with the follow-on reprocurement. The amount of $271,006 includes only those costs incurred in the reprocurement prior to award of the contract.

24. The reprocurement amounts above include only those amounts until notice to proceed was issued. Separate from that, the Government incurred significant costs in the continued administration of a second contract.

25. Liquidated damages are used when the parties agree (by contract) that the Government may reasonably expect to suffer damage if the delivery or performance is delinquent, and the extent of that damage is difficult or impossible to accurately estimate or prove.

26. The clause included in the contract and agreed to by the parties, as well as the relevant portions of the FAR are unequivocal on this issue:  "These liquidated damages *are in addition to excess cost of repurchase* under the Termination clause of the CONTRACT CLAUSES" Special Clause SC-2 (Emphasis added), see also FAR 49.402-7(a).

27. Beyond the additional costs of daily administration, the United States suffered damage which is difficult or impossible to accurately estimate, in the form of loss of full use of the channel and boat basin by the United States Coast Guard, members of the Quileute Nation, and other small boat harbor tenants and users.  This loss spanned 9 months, before the follow-on contractor could complete the work MIC had failed to do.

28. FAR 49.402-7(a) and Special Clause SC-2 state that the Government may make a demand for liquidated damages which is in addition to the other excess costs of the reprocurement.  Here, completion of the work was delayed – through no fault of the Government or the follow-on contractor – until November 6, 2015.  This 251-day delay was the direct result of the failure of MIC to complete the work required in the contract.

Exhibit 3
Page 4 of 7

SUBJECT: Contract W912DW-14-C-0024, FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014, Contracting Officer Final Decision on Reprocurement Costs and Demand for Payment.


# PART V.  CONCLUSION

29. MIC breached its obligations under the subject contract, causing significant harm to the Government. Therefore, based on the preceding information and analysis, it is my final decision that MIC owes the Government the amount of $1,031,751.50.


# PART VI.  RESERVATIONS OF RIGHTS AND REMEDIES

30. Based on the information available to the Government at this time, the Government believes that this amount represents the full amount required to settle the harm to the Government from MIC's failure to complete its obligations under the above referenced contract.  However, the Government reserves the right to adjust this amount should new information become available.

31. Additionally, the Government has only recently become aware that MIC's dredging activities in the boat basin may have caused damage to property of the Quileute Nation, which would be the responsibility of MIC to rectify under FAR clause 52.236-7.   The Government is working with the Tribe to determine what the extent of this damage may be.

32. Nothing in this demand releases any rights or remedies otherwise reserved to the Government.


# PART VII.  DEBT NOTIFICATIONS

33. If the contractor believes this debt in invalid, or the amount is incorrect, contractors should contact the undersigned Contracting Officer.

34. If the contractor agrees, the contractor should remit a check payable to the agency's payment office annotated with the contract number along with a copy of the demand for payment to the payment office identified in the contract.

35. The payment office may initiate procedures, in accordance with the applicable statutory and regulatory requirements, to offset the debt against any payments otherwise due the contractors.

36. The debt may be subject to administrative charges in accordance with the requirements of 31 USC 3717(e) and the Debt Collection Improvement Act of 1996.

37. The Contractor may submit a request for installment payment for deferment of collection if immediate payment is not practicable, or if the amount is disputed.

Exhibit 3
Page 5 of 7

SUBJECT: Contract W912DW-14-C-0024, FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014, Contracting Officer Final Decision on Reprocurement Costs and Demand for Payment.

## PART VIII. INTEREST

38. This amount is now due.  Pursuant to FAR 52.232-17, if this amount is not paid within 30 days of the date of this letter, interest shall begin to accrue at the rate establish by the Secretary of the Treasury.

## PART IX.  RIGHT TO APPEAL

This is the final decision of the Contracting Officer.  This decision may be appealed to:

Armed Services Board of Contract Appeals
Skyline Six, 5109 Leesburg Pike, 7th Floor
Falls Church, VA  22041-3208

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's—

(1) Small claim procedure for claims of $50,000 or less *or, in the case of a small business concern (defined in the Small Business Act and regulations under that Act), $150,000 or less*; or

(2) Accelerated procedure for claims of $100,000 or less.

Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.  I note that MIC has likely already made this election, by filing a complaint currently before the Court of Federal Claims for related claims on 13 October 2015.

Sincerely,

*Bonlie L. Lackey*

Digitally signed by
LACKEY.BONILIE.L.1110439659
DN: c=US, o=U.S. Government,
ou=DoD, ou=PKI, ou=USA,
cn=LACKEY.BONILIE.L.1110439659
Date: 2016.12.21 13:57:40 -08'00'

BONILIE L. LACKEY
Contracting Officer

CF: (cont. on next page)

Exhibit 3
Page 6 of 7

SUBJECT: Contract W912DW-14-C-0024, FY14 Maintenance Dredging, Quillayute River Waterway, La Push, Washington, awarded September 12, 2014, Contracting Officer Final Decision on Reprocurement Costs and Demand for Payment.


CF:

Western Surety Company
Mark McKibbin, mark.mckibbin@cna.com
333 S. Wabash Ave.
Chicago, IL 60604

Durham and Bates Agency
Greg Ryerson, greg@dbates.com
(503) 242-9405

Bond: No. 929593489

Yuri Dyson yuri.dyson@sba.gov
Business Opportunity Specialist
U.S. Small Business Administration
620 SW Main Street, Suite 313
Portland, OR 97205
Ph: (503) 326-6692
pdxhelp@sba.gov

Exhibit 3
Page 7 of 7

## CERTIFICATE OF SERVICE

I hereby certify that on the date shown below, I served a true and correct copy of the

foregoing SECOND AMENDED COMPLAINT on:

> Michael Duane Austin
> US Department of Justice
> Commercial Litigation Branch
> Civil Division
> United States Department of Justice
> PO Box 480
> Ben Franklin Station
> Washington DC 20044
> E-mail:  michael.austin@usdoj.gov
>              Attorney for the United States

☐  by first class mail, postage prepaid.

☐  by hand delivery.

☐  by facsimile transmission.

☐  by facsimile transmission and first class mail, postage prepaid.

☒  by electronic transmission.

☐  by electronic transmission and first class mail, postage prepaid.

DATED:  January 16, 2017.


By: s/ Joseph A. Yazbeck, Jr.
Attorney(s) for Plaintiff Marine
Industrial Construction, LLC